2025 IL App (2d) 250103-U
No. 2-25-0103
Order filed June 25, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 24-CF-870 |
| DAVID R. GLASS, | ) ) ) | Honorable Mark R. Gerhardt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in denying pretrial release to defendant charged with multiple counts of child pornography, where the trial court's finding that defendant posed a threat to the community and no conditions could mitigate that threat was based on defendant's sophisticated knowledge of computer systems and his possession of over 7,000 files of suspected child sexual abuse materials. Affirmed.

¶ 2    Defendant, David R. Glass, appeals from the denial of his pretrial release under section 110-6.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-6.1 (West 2022)). As defendant did not file a memorandum, his motion for relief from pretrial detention serves as his

argument on appeal. See Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024). For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On September 5, 2024, defendant was arrested and charged via complaint with 10 counts of child pornography (possess visual reproduction on computer) (720 ILCS 5/11-20.1(a)(6) (West 2022)) and 10 counts of child pornography (reproduce or distribute) (*id.* § 11-20.1(a)(2)).

¶ 5     On September 6, 2024, the State filed a verified petition to deny pretrial release pursuant to section 110-6.1 of the Code. A hearing was held on the State's petition that same day.

¶ 6     At the hearing, the State proffered a probable cause statement, which stated as follows. On June 25, 2024, Detective Matthew Prentice of the Woodstock Police Department's Internet Crimes Against Children Task Force, conducted an online investigation into the sharing of child pornography or child sexual abuse materials (CSAM). The investigation was conducted on the BitTorrent network, a peer-to-peer digital file exchange. BitTorrent downloads are facilitated by ".torrent" files, which are smaller files that contain pieces of information about the larger file(s) being downloaded. A ".torrent" file acts like an index that allows computers to find information through the use of a BitTorrent client.[1]

¶ 7     While running the investigative software, Prentice observed that several other Illinois law enforcement officers, who were conducting similar online investigations, had obtained possible CSAM downloads from the same suspect device with an approximate location listed as Woodstock, Illinois. In total, three investigators obtained a total of 119 files which were

---

[1]A "client" is a program that requests and receives services or information from another computer.

subsequently provided to the Woodstock police. Downloads from the suspect device had been obtained on five different dates between June 6, 2024, and June 25, 2024.

¶ 8    Prentice viewed the downloaded files, which consisted of pubescent/teen aged females posing in short "webcam" videos in various stages of undress, a mix of short videos featuring pubescent/teen aged females, and several videos showing nude female children under the age of thirteen, including children engaging in sex acts. Many of the filenames included keyword references to child pornography, including "PTHC" (an abbreviation for pre-teen hard core), "10yo" (yo meaning years old) and "8yo".

¶ 9    A grand jury subpoena was issued to Comcast seeking subscriber information associated with the suspect device's IP address. The subscriber was identified as David Glass with an address in Wonder Lake, Illinois. Police determined that defendant and his mother were the sole occupants of the home.

¶ 10    On August 6, 2024, a fourth Illinois investigator obtained several downloads from the suspect device. On August 10 and 11, 2024, Prentice successfully completed a download of 207 files from the suspect device. Prentice observed a considerable proportion of them depicted children, many under the age of thirteen, including toddlers and infants, engaged in sexual acts with adults. Additionally, a few of the files contained bestiality and bondage or torture.

¶ 11    On August 20, 2024, approximately fifteen additional connections were made between Detective Prentice's investigative software and the suspect device which resulted in several thousand files downloaded. Many of the files were short "web cam" videos, depicting pubescent teenage girls estimated to be between 13 and 18 years old. After checking the investigative software logs, Woodstock police observed that direct connections and downloads from the suspect

device occurred consistently during the month of August and as late as September 2, 2024.

¶ 12   On September 5, 2024, a search warrant was conducted on defendant's home. Digital Forensic Examiners (DFEs) from the Illinois Attorney General Internet Crimes Against Children (ICAC) Task Force were also present to assist in executing the warrant. Contact was made with defendant at the rear of the house.

¶ 13   After defendant was given *Miranda* warnings, he admitted to using BitTorrent to download and share child pornography with other users. Defendant also stated that he was aware that BitTorrent shares files after they are downloaded. Additionally, defendant advised that he would often leave files in BitTorrent after the downloads had completed, aware that those files were being shared with other users.

¶ 14   According to Prentice, defendant appeared to be knowledgeable about computers, computer hardware, and peer-to-peer networks. More than ten computers were seized from the home, as well as dozens of hard drives, hundreds of disks, and USB drives. DFEs found that defendant's devices inside the home contained tens of thousands of files amounting to over 20 terabytes of storage. Defendant also had a home server, which was similar to what would be found in a small business. While previewing the devices, DFEs located a large amount of "age-difficult" teenage pornography in addition to many files which featured apparent child pornography. Due to the large amount of data stored, Prentice believed it was likely that additional child pornography would be located on the recovered devices.

¶ 15   Defendant disputed that he posed a real and present threat to any persons or the community, arguing that he was 57 years old, was employed prior to his arrest, had a pretrial risk score of zero, had no criminal history, and there were no allegations that defendant created the material or

threatened any minors. Defendant maintained that there were conditions of release that the trial court could put in place to mitigate any risk that defendant might pose to the community, such as home confinement with a curfew to allow defendant to go to and from work. Defendant acknowledged that he had access to a computer at work, but he argued that the computer had no internet access and that there was no other potential for contact with minor children.

¶ 16 The trial court granted the State's petition to deny pretrial release. Regarding dangerousness, the trial court found that although there was no indication that defendant had engaged in the creation of the materials, defendant's consumption and distribution of CSAM created an appetite for the content and thus posed a real and present threat to the community at large.

¶ 17 Regarding conditions, the trial court found that no condition or combination of conditions could mitigate the threat posed by defendant, emphasizing the sheer volume of the content—more than 10 computers were seized from the home, as well as dozens of hard drives and hundreds of disks and USB drives—and defendant's distribution of the material. Additionally, the court pointed to defendant's admission to having knowledge of tools like VPNs, which can be used to run BitTorrent software outside the detection of law enforcement. Therefore, the court found that no conditions could mitigate the real and present threat that defendant would fall back into collecting and distributing CSAM.

¶ 18 On January 21, 2025, defendant filed a motion to modify pretrial release conditions. A hearing was held on defendant's motion on January 23, 2025. At the hearing, defendant argued that continued detention was not necessary because there was nothing in his background, nor did the record suggest that defendant would continue to engage in any of the behavior with which he

was charged. Defense counsel also proffered that defendant was a caretaker for his 80-year-old mother, and both of them had been greatly affected by his detainment.

¶ 19 Defendant argued that, as a result of being in custody for four and a half months, there were conditions at that point in time which would mitigate any threat he might pose to the community, due to the deterring factor of being returned to jail. Specifically, his movements could be monitored by a GPS device, and he could be placed on a curfew. Additionally, if defendant were permitted to keep the one computer that remained in the home, which was a 15-year-old laptop belonging to his mother, McHenry pretrial services had software called "Remote Com" which could be placed on the computer to monitor everything done on the device. In the alternative, defendant would agree to remove the one remaining computer if granted pretrial release.

¶ 20 The State called Detective Prentice, who led the Woodstock Police's ICAC investigation, to testify. Prentice walked through the ease with which BitTorrent can be accessed by anybody with internet access, asserting that it can be downloaded like an app via Google search.

¶ 21 Prentice testified that throughout August 2024, investigators were able to download files from the suspect device "[p]robably 50 or more" times, recovering more than 7,000 files. The files contained multiple info hashes, indicating that there were multiple ".torrents" from the suspect device. According to Prentice, this signaled a pattern of abuse via deliberate downloads rather than an accidental download of CSAM, because info hashes are associated with specific ".torrents." Prentice noted that some of the downloaded files were "amongst the most severe child pornography that [he had] ever seen." Based on the DFEs' previews of the files downloaded onto defendant's devices, investigators were able to observe "probably dozens or hundreds of files" with CSAM, and the dates on the files indicated that defendant's intentional exposure to

pornography dates back "many years." Prentice further testified that based on the logs, "some of those files have been on those devices for years."

¶ 22    After describing the execution of the search warrant on defendant's home, Prentice described defendant's home setup as a "pretty involved" workstation, including lots of computers, as well as stacks of disks, hard drives, and thumb drives. The detective also spoke with defendant, who indicated that he was looking for webcam videos of teenage girls between the ages of sixteen and eighteen. Defendant also acknowledged that he had some "younger stuff," which the detective took to mean files of children under the age of 13. Defendant indicated that the files of younger children were still on the computer because he had not had a chance to delete them yet. Finally, defendant indicated knowledge of VPNs and said he had tried them in the past, but that they "weren't for him."

¶ 23    Prentice testified that although defendant was not using a VPN during the investigation, he was using portable apps, which are applications loaded onto a USB or thumb drive that run directly off of that device. The BitTorrent client that defendant was using was a version that could be used on a portable app, which meant that defendant could run the software directly from the thumb drive without installing the software on any computer.

¶ 24    On cross-examination, Prentice stated that, while it is possible for files received through the ".torrent" to be inconsistent with what is put in as a search term, the majority of the files downloaded from defendant's devices were consistent with his search for child pornography of 16- to 18-year-old teenagers. Prentice also stated that even though he believed that all the computers but the mother's laptop had been removed, given the quantity of "stuff" in the house, it was possible that something could have been missed during the home search. Additionally, police

would not have the technology or capability to search and monitor defendant's IP traffic going forward, as a VPN or end-to-end encryption could mask internet habits and usage.

¶ 25 Defendant again argued that there are conditions that could mitigate any threat the defendant posed to the safety of the community. Defendant and his mother were willing to remove all devices with internet access from the home. Alternatively, if the trial court allowed the computer to stay at the home, GPS tracking and internet tracking software would be able to monitor any online activity. Following the hearing, the trial court found that defendant's continued detention was necessary to avoid the threat defendant posed to the community, finding the facts of the case to be similar to those in *People v. Currier*, 2024 IL App (2d) 240478-U.

¶ 26 On February 20, 2025, defendant filed a motion for relief from pretrial detention pursuant to Illinois Supreme Court Rule 604(h)(2) (eff. Apr. 15, 2024). A hearing was conducted on March 13, 2025. Defendant reiterated that there were a number of conditions the trial court could put on defendant to mitigate any threat he might pose to anybody in the community. The State reemphasized the trial court's previous finding that the analogous portions of *Currier* outweighed the distinguishable portions; additionally, the sophistication of defendant's setup along with the amount of CSAM on defendant's devices raised the potential that defendant would not comply with conditions set by the court. The trial court ultimately denied the motion and defendant timely appealed.

¶ 27                                    II. ANALYSIS

¶ 28 On appeal, defendant argues that the State failed to meet its burden to establish that defendant poses a real and present threat to the safety of anyone in particular, or the community-at-large. Additionally, defendant argues that the State failed to prove that no condition or set of

conditions could be imposed on defendant to mitigate any safety threat posed by his release. Defendant does not challenge the trial court's findings regarding the commission of a qualifying offense.[2]

¶ 29    "[W]hen live witness testimony is presented at a pretrial detention hearing, a circuit court's ultimate detention decision under section 110-6.1, in addition to any underlying factual findings supporting the decision, will not be disturbed on review unless found to be contrary to the manifest weight of the evidence." *People v. Morgan*, 2025 IL 130626, ¶ 43. A finding is against the manifest weight of the evidence when it is unreasonable. *People v. Sims*, 2022 IL App (2d) 200391, ¶ 72.

¶ 30    All defendants shall be presumed eligible for pretrial release, and the State shall bear the burden of proving otherwise by clear and convincing evidence. 725 ILCS 5/110-6.1(e) (West 2022). To deny a defendant pretrial release, the State must show (1) that the proof is evident or the presumption great that the defendant has committed an eligible offense, and (2) the defendant poses a real and present threat to the safety of any person or persons or the community, which (3) no condition or combination of conditions can mitigate. *Id.* § 110-6.1(e)(1)-(3).  The trial court's finding that no combination of conditions can mitigate the threat posed by a defendant must be based on the specific articulable facts of the case. *Id.* § 110-6.1(e)(3). The base allegations which comprise the elements of the charged offense are not sufficient to establish such on their own. *People v. Stock*, 2023 IL App (1st) 231753, ¶ 18 ("If the base allegations that make up the *sine qua*

---

[2]Defendant's motion for relief sets forth only the bare assertion that the trial court erred in its findings on dangerousness and release conditions. While issues not raised in the motion for relief are deemed waived, as the State's memorandum did not raise the issue of waiver and chose to address the merits of defendant's arguments before the trial court, we will address defendant's underlying arguments.

*non* of a violent offense were sufficient on their own to establish this element, then the legislature would have simply deemed those accused of violent offenses ineligible for release."). However, the alleged facts which comprise the basic elements of the charged offense can be relevant proof establishing that no conditions can mitigate the threat posed by defendant. *Id.*

¶ 31    In considering whether and which conditions of pretrial release will reasonably ensure the safety of any other person or the community and the likelihood of compliance by the defendant with all conditions of pretrial release, the trial court considers several factors. These include the nature and circumstances of the charged offense, the weight of the evidence against the defendant, the history and characteristics of the defendant, the nature and seriousness of the threat posed by the defendant based on the specific articulable facts of the case, and the risk of defendant obstructing the criminal justice process. 725 ILCS 5/110-5(a) (West 2022).

¶ 32    Defendant attempts to distinguish the present facts from those in *People v. Currier*, 2024 IL App (2d) 240478-U, arguing that, unlike *Currier*, he had not utilized a VPN and was cooperative with law enforcement. Further, defendant argued that several statutory factors favor his pretrial release. Defendant is a 57-year-old honorably discharged veteran with no previous criminal history and scored a zero on his pretrial risk assessment. Defendant was also gainfully employed at the time of his arrest and resides with his 80-year-old mother, for whom defendant plays a significant role in day-to-day care.

¶ 33    Defendant further argues that the four-and-a-half months he had already been in custody created a strong deterrent effect, which mitigates the likelihood that he would consider engaging in similar behavior in the future. Moreover, all electronics were removed from defendant's home, other than an old laptop owned by his mother, which defendant argues can be monitored or

removed from the home, thereby eliminating any threat he poses to the community.

¶ 34    Additionally, defendant argued that there are a number of conditions that can mitigate any risk he poses to the community. Defendant's proposed conditions include a curfew and GPS monitoring to ensure that he is not going to purchase electronics or devices that could be utilized to access the internet. Additionally, defendant argues that McHenry pretrial services has software that can be placed on a computer, such as defendant's mother's laptop, that would monitor all online activity done on the computer.

¶ 35    In response, the State argues that the trial court's decision was supported by evidence that "demonstrated defendant's appetite and sophisticated capability to amass and distribute massive volumes of CSAM to apparently unrestricted global consumers." Given defendant's knowledge of VPNs and years of undetected activity, there are no conditions that can prevent him from continuing to disseminate child pornography anonymously on the internet. Additionally, the quantity of CSAM indicates that defendant would continue trying to access child pornography again if released, regardless of conditions imposed by the court.

¶ 36    Considering the factors set forth in Section 110-6.1(g) of the Code (725 ILCS 5/100-6.1(g) (West 2022)), the trial court's finding that defendant posed a real and present threat to the safety of the community was based on the specific articulable facts of the case and was not against the manifest weight of the evidence. The record demonstrates that defendant has shown a proclivity for CSAM and has operated an extensive system to obtain and store large quantities of CSAM. Over 20 terabytes of material was seized from defendant's home, and many of the 7,000 files downloaded from the suspect device during the investigation contained CSAM. Given the amount of material seized from defendant during the execution of the search warrant, it is likely that

additional CSAM files will be found on defendant's computers and hard drives. Moreover, the conduct had taken place over a prolonged period, given the extensive amount of material and the fact that dates on certain files went back years.

¶ 37    These facts align with our decision to affirm pretrial detention in *People v. Currier*, 2024 IL App (2d) 240478-U and demonstrate that defendant poses a real and present threat to the safety of the community. In *Currier*, we affirmed the trial court's denial of the defendant's pretrial release on child pornography charges. *Id.* As in this case, the defendant in *Currier* utilized BitTorrent software to download and disseminate a large number of CSAM files and had a sophisticated home computer setup including a server. *Id.* ¶¶ 10-14. Unlike the instant case, the defendant in *Currier* utilized a VPN to mask his online activity, encrypted his system, and did not cooperate with law enforcement. *Id.* ¶ 11. In denying the defendant pretrial release, the trial court noted that he had sophisticated knowledge of computers, and the State required "luck" to possess evidence against the defendant, as he happened to be disconnected from his VPN at the time police connected to his IP address and was logged into his system at the time the search warrant was executed. *Id*. ¶ 16. Further, the court reasoned that given the volume of the defendant's collection of CSAM and defendant's lack of cooperation with law enforcement, the trial court did not believe defendant would comply with conditions of pretrial release. *Id*. We held that, the trial court properly found that no set of conditions could mitigate the threat posed by defendant. Several factors supported its finding, including the volume of CSAM found on defendant's devices, defendant's distribution of such material, and the number of computers and hard drive devices seized from defendant's home. Moreover, defendant had knowledge of computers, peer-to-peer networks, and VPNs, which can run software outside the detection of law enforcement.

¶ 38 Although defendant here did not use a VPN to evade police detection, he had evaded detection for "many years." It is clear that, based on the number of electronic devices found in defendant's home, his use of portable apps to avoid downloading BitTorrent onto a computer itself, and his sophisticated knowledge of computers, if released, defendant would have the knowledge, ability and motivation to evade future detection by law enforcement. Moreover, defendant stated that he would intentionally leave files on the BitTorrent network after downloading, aware that the files would be available for other users to download. These factors all align with those in *Currier,* 2024 IL App (2d) 240478-U, ¶ 29.

¶ 39 Defendant's level of sophistication and pattern of conduct during the span of many years, evinces a strong predilection for child pornography, and the capability of accessing and distributing such materials without being detected. Therefore, based on the specific articulable facts of this case, the trial court found that no conditions could mitigate the threat posed by defendant. These findings were particularized to defendant's specific computer knowledge, prolonged illegal activity, and use and distribution of vast amounts of CSAM.

¶ 40 Accordingly, the trial court's findings that defendant posed a real and present threat to the safety of the community, and that no conditions could mitigate the threat posed by defendant were not against the manifest weight of the evidence.

¶ 41                                   III. CONCLUSION

¶ 42 For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 43 Affirmed.